# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 24-1269V**

| | |
|---|---|
| JEFFREY ARDITTI,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: October 5, 2026 |

*David John Carney, Green & Schafle, LLC, Philadelphia, PA, for Petitioner.*

*Jeremy Mauritzen, U.S. Department of Justice, Washington, DC, for respondent.*

**DECISION DISMISSING CASE**[1]

On August 19, 2024, Jeffrey Arditti ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered from Guillain-Barré syndrome ("GBS") following an influenza ("flu") vaccine he received on September 21, 2021. Petition at 1. This case was assigned to the Special Processing Unit of the Office of Special Masters.

On February 26, 2025, I ordered Petitioner to show cause why this case should not be dismissed, as onset occurred not only outside the Table timeframe for a claim of GBS due to the flu vaccine, but also occurred too long after vaccination to be medically acceptable under the test for a causation-in-fact claim. ECF No. 14. Petitioner filed a

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

response, along with medical literature, on April 28, 2025. ECF No. 17-18. ("Opp."). For the reasons discussed below, this claim is hereby **DISMISSED**.

## I. Procedural History

The Petition, filed August 19, 2024, alleges a Table claim, or in the alternative, a causation-in-fact claim, for Petitioner's GBS after a flu vaccine. Petition at ¶48-49. Respondent's Rule 4(c) Report argued that because Petitioner did not experience the onset of GBS symptoms until more than nine weeks after vaccination, the claim was not viable. Rule 4(c) Report at 6-8. Specifically, Respondent argued that "the preponderant evidence demonstrates that Petitioner did not suffer the first symptom or manifestation of onset of GBS until November 28, 2021, nine weeks and five days after the subject vaccination, or a total of sixty-eight days, which is well beyond the Table timeframe." *Id.* at 7.

In light of this argument and my review of the record, I ordered Petitioner to show cause why this claim should not be dismissed.[3] ECF No. 14. Petitioner filed his response ("Resp."), along with medical literature, on April 28, 2025. ECF No. 17-18. The matter is ripe for resolution.

## II. Factual Background

Petitioner was 60 years old when he received a flu vaccine on September 21, 2021, during an annual physical with his primary care provider ("PCP"). Ex. 1 at 159, 163. Petitioner had no neurological medical history prior to vaccination.

On September 26, 2021, Petitioner sent a message to his PCP stating that he "felt wiped out" and possibly had a fever. Ex. 1 at 195. He asked about a possible flu vaccine reaction. *Id*. Two days later, on September 28, 2021, Petitioner informed his PCP that he tested positive for Covid-19. *Id.* at 189. He received a monoclonal antibody infusion on October 1, 2021. *Id.* at 193. Petitioner sent a message to his PCP on November 24, 2021, asking whether he should receive a Covid-19 vaccine in light of his recent infection. *Id*. at 210.

Petitioner contends that his GBS symptoms began on November 27, 2021 (67 days, or more than nine weeks after vaccination), when he kept falling behind his hiking group and "even slipped and fell one time" due to feeling "slightly weaker than usual." Ex.

[3] I also cautioned Petitioner's counsel that if the response to the show cause order relied primarily on witness testimony aimed at establishing that Petitioner's symptoms began sooner than the medical records establish, reasonable basis issues would be raised that could imperil some of the fees to which counsel would otherwise be entitled. ECF No. 14 at 2.

2 at ¶10; *See also* Petition at ¶5. The following day, Petitioner states that he "noticed a mild numbness in some of [his] toes." Ex. 2 at ¶11.

Petitioner recalled mild numbness in his feet on the morning of November 29, 2021 before he flew to Chicago on a business trip. Ex. 2 at ¶12. He visited a store that afternoon and fell while in the fitting room. *Id*. at ¶13. Petitioner recalled calling his brother (a medical professional) and being urged to see a doctor. *Id*. at ¶14. He stated that he spoke with his PCP on the phone on November 30, 2021 and was advised to go to the emergency room in Chicago. *Id*. at ¶15.

Petitioner sought treatment in the emergency room on November 30, 2021. Ex. 3 at 22. He reported numbness in his hands and feet and weakness in his legs. *Id*. He also noted a fall on his upper right shoulder while hiking on Saturday (three days prior), but denied any weakness or numbness at that time. *Id.* He reported that his feet "felt funny, almost like [his] shoe was too tight" on Sunday (two days prior). *Id*. He reported numbness in his feet on Monday morning (one day prior) that progressed to numbness in his hands up to his forearms, thigh pain and weakness, and pain in both shoulders. *Id.* Finally, he reported receiving Covid-19 vaccinations in February/March, having a Covid-19 infection on September 27, 2021, and receiving a monoclonal antibody treatment on October 1, 2021. *Id*.

Petitioner was seen by a neurologist in the hospital the same day. Ex. 3 at 44. He reported his Covid-19 infection and his flu vaccine in September. *Id*. He told the neurologist that while hiking on November 27, 2021 "he slipped on his right foot and hit his shoulder causing some pain in his right shoulder down to his right elbow." *Id*. at 46. One provider recorded "no major GI illness recently" and another recorded a "mild stomach issue a week prior." *Id*. at 44, 46. At that time, all of his extremity deep tendon reflexes were absent and his lumbar puncture results were consistent with GBS. *Id*. at 44. Petitioner was admitted for PLEX treatment. *Id*. at 50.

Petitioner was hospitalized through December 20, 2021. Ex. 3 at 231. During his hospital stay, Petitioner was found to be positive for Epstein Barr virus, but "had a non-concerning viral load." *Id*. at 232. He was discharged to inpatient rehab, where he remained through February 15, 2022, when he was able to fly home. *Id*.; Ex. 5 at 132. A hospital neurologist noted during a consult that "vaccinations [were] not recommended for 1 year after disease onset." Ex. 3 at 50. On December 12, 2021, a hospital hepatologist noted in the plan that s/he "would clarify if patient should continue to receive flu vaccines in future given association with GBS." *Id.* at 78.

On February 6, 2022, Petitioner sent an email to his PCP to establish necessary care providers upon his return from Chicago. Ex. 1 at 363-64. He stated that he had to

"admit [he had] to attribute the possibility that Covid that [he] had on September 27 possibly the monoclonal therapy on October 1 could have played a part in this although [he] had a stomach virus for one day in the middle of November which [he knew] can be related also [sic]." *Id*.

On March 9, 2022, Petitioner established care with an out-patient neurologist. Ex. 1 at 596. He reported feeling normal in November 2021, other than a "mild GI illness (stomach pain/diarrhea) approximately two weeks prior to GBS symptoms." *Id.* His doctor noted Petitioner's Covid-19 infection in September 2021 and his Covid-19 vaccinations in February and March 2021. *Id*. at 596-97. The doctor specifically noted that Petitioner "did not receive any vaccinations in the month preceding the onset of GBS symptoms." *Id.* at 597. Petitioner was given a refill of gabapentin and advised to continue physical, occupational, and speech therapies. *Id*. at 601. He was advised that he was "ok for vaccinations including Covid booster as his GBS was not triggered by a vaccination." *Id*.

Petitioner saw his PCP on March 28, 2022. Ex. 1 at 639. His doctor opined that "the cause of his [GBS] is unknown" after considering Petitioner's flu vaccination and other intervening factors. *Id*. at 647. In response to Petitioner's question about future vaccinations, the doctor stated he would discuss the question with infectious disease professionals. *Id*. On April 19, 2022, the doctor advised that because it "seems most likely that [Petitioner's] GBS was from a GI infection, a Covid-19 booster vaccination was recommended. *Id*. at 684.

Petitioner continued to treat his ongoing GBS symptoms with medications and therapies into 2023.

## III. Authority

*General Legal Bases for Entitlement*

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his/her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony

and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). However, although later oral testimony that conflicts with medical records is less reliable, it is appropriate for a special master to credit a petitioner's lay testimony where is does not conflict with contemporaneous records. *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1382-84 (Fed. Cir. 2021).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C). For both Table and Non–Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter., Inc. v. United States*, 6 Cl. Ct. 476, 486 (1984) (explaining that mere conjecture or speculation is insufficient under a preponderance standard).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non–Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury." Each *Althen* prong requires a different showing and is discussed in turn along with the parties' arguments and my findings.

Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must also coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 2013 WL 1896173 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11–355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for review den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

*Standards Applicable to Table GBS Claim*

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, GBS is compensable if it manifests within 3-42 days (not less than three days and not more than 42 days) of the administration of an influenza vaccination. 42 C.F.R. § 100.3(a)(XIV)(D). (Further criteria for establishing a GBS Table Injury case be found under the accompanying qualifications and aids to interpretation. 42 C.F.R. § 100.3(c)(15)). Any onset outside that timeframe prevents the matter from succeeding as a Table claim, although it can often still be maintained as a non-Table, causation-in-fact claim.

In practice, cases alleging a Table GBS/flu vaccine claim are often dismissed for failure to establish the proper Table onset. *See,* e.g., *Randolph v. Sec'y of Health & Human Servs.*, No. 18-1231V, 2020 WL 542735, at *8 (Fed. Cl. Spec. Mstr. Jan. 2, 2020) (finding GBS onset at the earliest occurred 76 days post-vaccination, "well outside the 3-42-day window set by the Table for a flu-GBS claim"). Special masters have frequently noted that six to eight weeks is the longest medically-acceptable timeframe recognized in the Vaccine Program for onset of post-flu vaccine GBS. *See, e.g.*, *Chinea v. Sec'y of Health & Human Servs.*, No. 15-095V, 2019 WL 1873322, at *33 (Fed. Cl. Mar. 15, 2019), *mot. for review den'd*, 144 Fed. Cl. 378 (2019) (onset of the petitioner's GBS occurred eleven to twelve weeks after her vaccination, well beyond the six- to eight-week medically appropriate timeframe for the occurrence of vaccine-induced GBS); *Barone v. Sec'y of Health & Human Servs.*, No. 11-707V, 2014 WL 6834557, at *13 (Fed. Cl. Spec. Mstr. Nov. 12, 2014) (finding eight weeks (or 56 days) is the longest reasonable timeframe for a flu vaccine/GBS injury). And even that timeframe is not set in stone as "medically acceptable."

*Consideration of Medical Literature*

Petitioner filed ten medical and/or scientific papers in support of his case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted in this case, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015-5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

## Analysis

Although Petitioner alleges that he suffered a GBS Table injury, he does not attempt to argue that the onset of his GBS symptoms falls within the Table's 3-42 day timeframe. *See* Petition at ¶5, 48; Ex. 2 at ¶10. And indeed - the contemporaneous medical records preponderantly establish that any initial neurologic symptoms occurred, at the earliest, on November 27, 2021 (as alleged). *See e.g.* Ex. 3 at 22, 46, 596. Thus, there is no dispute that the onset of Petitioner's GBS occurred at least 67 days (or more than nine weeks) after his vaccination - meaning no Table claim is viable in this case.

That still leaves the possibility, however, that a causation-in-fact claim could succeed. But although there are a number of potential issues with such a claim,[5] the lengthy post-vaccination onset is the primary stumbling block – and Petitioner has not preponderantly demonstrated that he could establish, under *Althen* prong three, that a more than nine-week, post-vaccination onset is medically acceptable.

To support the lengthy onset, Petitioner has provided ten articles that he maintains demonstrate that GBS onset can occur far more than six weeks after vaccination, and that his 67-day onset thus "falls within the broader timeframe recognized" in the literature. Resp. at 33-34; Ex. 8-17. But they do not support his argument. Those articles that reference the timeframe for vaccine-associated GBS[6] merely reinforce the Table onset requirement, finding the most significant risk occurs *within* the first six weeks – or 42 days after vaccination (although some studies did not

---

[5] For example, Petitioner's GBS may have had another cause. The medical record establishes several potential intervening causes between his vaccination and the onset of his symptoms, including: (1) a Covid-19 infection one week after vaccination, (2) a monoclonal antibody infusion on October 1, 2021, (3) a gastrointestinal illness about two weeks prior to onset, and/or (4) an Epstein Barr virus infection (found through blood testing during his hospitalization). *See* Ex. 1 at 189-192; Ex. 3 at 46, 232. Even *Petitioner* did not attribute his GBS to his vaccination when contacting his PCP about his discharge from inpatient treatment in Chicago. *See* Ex. 1 at 363-64 (stating he had to "admit [he had] to attribute the possibility that Covid that [he] had on September 27 possibly the monoclonal therapy on October 1 could have played a part in this although [he] had a stomach virus for one day in the middle of November which [he knew] can be related also [sic]."). The questions raised by these facts would require evaluation even if onset were deemed medically acceptable.

There are also significant issues with Petitioner's prong two showing. He notes that treaters deemed his GBS to possibly have a vaccine association. Resp. at 31-32; 34-35. But there is only one record that could arguably be said to "attribute" Petitioner's GBS to his flu vaccine. During a hepatology consult during Petitioner's hospitalization (on December 12, 2021), a doctor noted that s/he "would clarify if patient should continue to receive flu vaccines in future given association with GBS." Ex. 3 at 78. That record is buffered somewhat by a note from a hospital neurologist that "vaccinations [were] not recommended for 1 year after disease onset." Ex. 3 at 50. However, other than these notations, there is no evidence in the record that any treating provider concluded that Petitioner's GBS was caused by his flu vaccine from September. And, both Petitioner's outpatient neurologist and his PCP (after consultation with an infectious disease expert) cleared him for vaccinations. Ex. 1 at 601; 684. Both expressly concluded that his GBS was unlikely to have been triggered by vaccination. *Id.*

[6] One article did not discuss the timing of symptoms onset at all, focusing instead on the causes, diagnosis, and treatment of GBS cases. S. Leonhard et al*, Diagnosis and Management of Guillain-Barre Syndrome in Ten Steps,* 15 Nature Reviews (Neurol.): 671-683 (2019), filed as Ex. 8 (ECF No. 18-1) ("Leonhard"). Another focused on whether vaccines other than the flu vaccine cause GBS, and discussed onset timing only when referring to the results in other items of literature. E. Israeli et al, *Guillain-Barre Syndrome – A Classical Autoimmune Disease Triggered by Infection or Vaccination*, 42 Clinic Rev. Alleg. Immunol.: 121-130 (2012), filed as Ex. 14 (ECF No. 18-7) ("Israeli").

Moreover, even those articles that assessed the link between the flu vaccine and GBS acknowledged that the majority of GBS cases are caused by *preceding infection*. *See,* e.g., Leonhard at 675; Israeli at 122-23; J. Stowe et al, *Investigation of the Temporal Association of Guillain-Barre Syndrome with Influenza Vaccine and Influenzalike Illness Using the United Kingdom General Practice Research Database*, 169 Am. J. of Epidem. 3:382 (2008), filed at Ex. 17 (ECF No. 18-10) ("an increased risk of Guillain-Barre syndrome was seen in the period shortly after influenzalike illness.").

find a statistically increased risk at all). Thus:

- N. Principi & S. Esposito*, Vaccine-Preventable Diseases, Vaccines and Guillain-Barre Syndrome*, 37 Vaccine 37:5 (2019), filed as Ex. 10 (ECF No. 18-3) ("[a]n association between vaccine administration and GBS is rarely found. . .. However, available data are reassuring because they demonstrate that, if any risk actually exists, it is so low that it cannot be demonstrated even with studies that include several million vaccines and unvaccinated controls.");

- L. Polakowski et al*, Chart-Confirmed Guillain-Barre Syndrome after 2009 H1N1 Influenza Vaccination among the Medicare Population 2009-2010*, 178 Amer. J. of Epidem. 6:968-69 (2013), filed as Ex. 11 (ECF No. 18-4) ("found a slightly increased statistically significant risk of GBS within the 6-week risk period after 2009 monovalent H1N1 influenza vaccination compared with the postvaccination control period" of 50-119 days with the risk "higher 8-21 days after vaccination than during the overall 1- through 42-day postvaccination period.");

- D. Salmon et al*, Association Between Guillain-Barre Syndrome and Influenza A (H1N1) 2009 Monovalent Inactivated Vaccines in the USA: a Meta-Analysis*, 381 Lancet:1464 (2013), filed as Ex. 13 (ECF No. 18-6) ("increased risk for Guillain-Barre syndrome in the first 42 days"); and

- N. Souayah et al*, Guillain-Barre Syndrome After Vaccination in United States: Date from the Centers for Disease Control and Prevention/Food and Drug Administration Vaccine Adverse Event Reporting System (1990- 2005)*, 11. J. Clin. Neuromusc. Dis. 1:4 (2009), filed as Ex. 16 (ECF No. 18-9) ("Souayah") ("the distribution of post-vaccination GBS follows a pattern with a peak occurrence within the first 2 weeks post-vaccination followed by a declining occurrence starting in the third week to reach a baseline in the fourth to sixth week").

Petitioner also (like many others arguing for long-onset GBS after vaccination) relies on L. Schonberger et al, *Guillain Barre Syndrome following vaccination in the National Influenza Immunization Program, United States*, Am. J. Epidemiology, 100:105-123 (1979) filed at Ex. 15 (ECF No. 18-8) ("Schonberger") to support his argument that a flu vaccine can cause GBS with symptom onset up to 10 weeks later. Resp. at 15-16. But even Schonberger concluded that the "period of increased risk . . . was concentrated *primarily within the five-week period after vaccination*." *Morris-Mazzetti v. Sec'y of Health & Human Servs.*, No. 22-260V, 2026 WL 1470263, at 9 (Fed. Cl. Spec. Mstr. Apr. 22, 2026) (emphasis added). The mere fact that cases in a study were *found* to have occurred

after the 42nd (or even 56th) day does not mean that it is *equally likely* that longer time frames are as medically acceptable as shorter ones. Indeed, some articles filed by Petitioner stand for the opposite view. *See,* e.g., Souayah at 4 (discussing the declining risk, even over the first six weeks/42 days after vaccination).

Although other special masters have referenced Schonberger as possibly supporting GBS onset beyond 42 days, cases where an onset longer than 56 days was deemed medically acceptable have presented remarkably unusual fact circumstances which are not present here, such as fact disputes about onset or special circumstances involving the petitioner at issue. *See,* e.g., *Spayde v. Sec'y of Health & Human Servs.*, No 16-1499V, 2021 WL 686682, at *19 (Fed. Cl. Spec. Mstr. Jan. 27, 2021) (involving an unclear onset date between 49 and 60 days). Petitioner's onset falls outside the *longest time* routinely accepted for a similar non-Table claim – eight weeks - and many days past as well. *See, e.g.*, *Chinea*, 2019 WL 1873322, at *33; *Barone,* 2014 WL 6834557, at *13.

The concept that a too-long onset for flu vaccine-caused GBS is inherently questionable does not flow from some kind of unfair, "bright line" rule that deprives otherwise-deserving claimants of their chance at proving causation. Rather, it is a function of medical science. "GBS has been defined as an acute, monophasic peripheral neuropathy involving rapidly-progressive and ascending weakness and paralysis, and which is thought to have an autoimmune mechanism." *Kaczerowski v. Sec'y of Health & Human Servs.*, No. 21-758V, 2025 WL 2798865, at *29 (Fed. Cl. Spec. Mstr. Aug. 28, 2025) (citing Leonhard at 671-72); *see also* Israeli at 122. The disease is associated with great amounts of acute inflammation and demyelination, rather than other autoimmune diseases (such as Lupus) in which autoantibodies build up over time causing symptoms months or years later. *See Reichert v. Sec'y of Health & Human Servs.*, No. 16-697V, 2018 WL 4496561, at *16 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (citing R. Hughes, et al., *Clinical and Epidemiologic Features of Guillain-Barré Syndrome*, 176 J. Infectious Diseases 92, 92 (1997) ("GBS is usually produced by acute inflammatory demyelinating polyradiculoneuropathy" in Western populations); H. Willison, *The Immunobiology of Guillain-Barré Syndromes*, 10 J. Peripheral Nerv. Sys. 94, 95 (2005) ("GBS is ... [an] acute inflammatory disorder" that comes and goes rapidly within four weeks)).

Because the autoantibodies that are theorized to drive GBS are created in response to an immune stimulus (here, a vaccine) usually within a period of two to three weeks, individuals who experience GBS will have neurologic symptoms manifest far *sooner* than many weeks after vaccination. And the risk of developing GBS after a flu vaccine wanes with time, since it becomes more unlikely that the autoantibodies thought responsible for the demyelination will both be generated and then attack the nerves – a fact specifically supported by Petitioner's filed literature. *See* Souayah at 4 ("the distribution of post-vaccination GBS follows a pattern with a peak occurrence within the

first 2 weeks post-vaccination followed by a declining occurrence starting in the third week to reach a baseline in the fourth to sixth week.”). The more time that passes from the date of vaccination, the less likely the vaccine instigated an aberrant response.

The Table time period for this kind of claim (which intentionally features a longer onset timeframe than the science actually supports, in the interests of fairness) accurately captures the most medically-acceptable timeframe in which this kind of vaccine-induced injury *would likely* occur (and the “more likely than not” standard of proof governs this *Althen* prong like all others). As I have noted in other decisions, “[t]he medical science *behind* a Table claim—the *raison d'etre* for its existence—should not be ignored simply because the claim can no longer succeed as a Table matter. That medical/scientific foundation (which led the Government to presume causation when certain facts are proven) remains meaningful, and should still be taken into account to some degree when deciding claims that “fall out” of the Table.” *Beckwith v. Sec’y of Health & Human Servs.*, No. 21-1660V, 2025 WL 2815711, at 16 (Fed. Cl. Spec. Mstr. Aug. 29, 2025), *mot. for review den’d,* 180 Fed. Cl. 368 (2026). The defined timeframe instead “reflects an intentionally-generous broadening of the period in which vaccine-associated GBS is expected by applicable medical science to most likely occur.” *Darby v. Sec’y of Health & Human Servs.*, No. 20-0836V, 2026 WL 2123856, at *6 (Fed. Cl. Spec. Mstr. June 15, 2026) (citing *Pierson v. Sec’y of Health & Human Servs.*, No. 17-1136V, 2022 WL 322836 (Fed. Cl. Spec. Mstr. Jan. 19, 2022); *National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132-01 at *45145 (July 29, 2015).

Petitioner argues that “one cannot put a cutoff date on an immune response because cutoff dates are arbitrary,” and that “each case needs to be evaluated individually based on the facts in the record without the application of an arbitrary and bright line cutoff date.” Resp. at 30-31. But the available evidence simply supports the conclusion that the longer timeframe at issue is *not likely* medically acceptable – not that because it falls outside of eight weeks, it automatically fails. To conclude otherwise would be to engage in the sort of “post hac ergo propter hoc” logic rejected by the Program. *See Galindo v. Sec’y of Health & Human Servs.,* No. 16-203V, 2019 WL 2419552, at *20 (Fed. Cl. Spec. Mstr. May 14, 2019). Vaccines *cannot* be responsible for every illness that post-dates their administration – and this is so *even* when a vaccine is understood to have some association with a particular disease or injury. That still leaves an important question: was the timeframe between vaccination and onset too long, or short, to conclude that the two events are *at all* related causally? Would the disease/injury process that the vaccine ushers in happen quickly, over a long time, or somewhere in between?

Given the foregoing, it is recognized in Program case law that some post-vaccination timeframes do not “work.” As time passes from a vaccination event, the

likelihood the vaccine was responsible for any subsequent alleged adverse effect inherently diminishes. *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1358-59 (Fed. Cir. 2006). "As a result, a too-long timeframe from vaccination to injury threatens to 'define away' the third prong, by permitting recovery for *any* post-vaccination harm, no matter how remote in time." *A.Y. v. Sec'y of Health & Human Servs.,* No. 17-850V, 2020 WL 5351342, at *21 (Fed Cl. Spec. Mstr. June 26, 2020), *citing Hennessey v. Sec'y of Health & Human Servs.*, 91 Fed. Cl. 126, 141-42 (2010) ("this theory accounts for symptoms which do not occur until years after vaccination, exacerbated by some other environmental trigger... [under this theory] it would be virtually impossible to determine that the vaccine, and not some other environmental condition, was the original triggering event.").

Petitioner also maintains he should be given the chance to offer expert input on this topic, citing to *Ray v. Secretary of Health & Human Services*, No. 20-0321V, 2025 WL 3900631 (Fed. Cl. Spec. Mstr. Dec. 12, 2025), where a claimant was afforded such an opportunity in attempting to prove long-onset GBS following receipt of a flu vaccine. Resp. at 2, fn. 1. However, the *Ray* petitioner asserted a GBS variant (chronic inflammatory demyelinating polyneuropathy) that is not as well understood to have a particular onset timeframe. *Ray*, 2025 WL 3900631 at *1. After the amended petition was filed, the case was transferred out of SPU for adjudication of that off-Table claim, which was later dismissed. *Id*. at *1. The utility of expert help there was of a different magnitude.

Petitioner has otherwise not been deprived of the chance to prove the third *Althen* prong. He was permitted to file additional medical support for a long onset, as noted by my review of the articles referenced above. None suggest it more likely than not that an onset exceeding nine weeks is likely medically acceptable. It is unclear to me why an expert's *ipse dixit* would make that finding more likely when existing medical literature cannot be identified that does the job or at least points in the direction Petitioner wants to go on this issue.

I am also not obligated to permit an expert's input in this matter (especially when it is my view that medical science does not likely support the kind of opinion the expert might offer). The determination of how best to resolve a case is a matter that lies generally within my discretion, provided that I "afford[ ] each party a full and fair opportunity to present its case." *Hovey v. Sec'y of Health & Human Servs.,* 38 Fed. Cl. 397, 400–01 (1997) (citing Rule 3(b)). Special masters are empowered to decide what discovery is needed to resolve a given matter. 42 U.S.C. § 300aa–12(d)(3)(B); *see also Felix v. Sec'y of Health & Hum. Servs.*, 172 Fed. Cl. 626, 632 (2024) ("[n]ot all vaccine cases merit expert witness testimony"); *K.A. v. Sec'y of Health & Hum. Servs.*, 164 Fed. Cl. 98, 115–19 (2022) (decision to deny requests to retain and present particular expert witness did not deprive the parties of "a full and fair opportunity to present his case" or otherwise

amount to an abuse of discretion), *aff'd*, No. 23-1315, 2024 WL 2012526 (Fed. Cir. May 7, 2024) (per curiam) (table). And it is appropriate for special masters to rely on their own experience in adjudicating claims within the Vaccine Program. *Beckwith v. Sec'y of Health & Human Servs.*, No. 21-1660V, 180 Fed. Cl. 368, 384-85 (2006).

Relying on my knowledge of the circumstances surrounding vaccine-induced GBS, and the low likelihood that the lengthy onset at issue was medically acceptable, I invited Petitioner to address the onset issue through an Order to Show Cause. ECF No. 14. In response, Petitioner filed a 35-page brief and ten scholarly articles, arguing that they support his causation argument. *See* ECF No. 17-18. Although Petitioner asserts otherwise, that literature does not support the conclusion that his immune process could extend 67 days after his vaccination and still *likely* be causal of his GBS. The present claim could be, and was, resolved fairly without the need for live testimony[7] from medical experts.

Petitioner has not provided sufficient evidence to overcome the Program's consistent yet *reasoned* negative reaction to overly-long post-vaccination GBS onset. And it is fair for special masters to reject claims that are not likely to succeed. It is not sufficient that there is a *possibility* of causation – there *always* is a possibility, but that is not the same as finding that it is "more likely than not" causation could occur. Because of Petitioner's inordinate onset not shown to be medically acceptable, he has not provided preponderant evidence that that the flu vaccine caused his GBS.

## CONCLUSION

Despite ample opportunity, Petitioner has failed to offer a persuasive, supported argument or explanation in response to my Order to Show Cause, as to why his claim should not be dismissed for failure to establish that onset of his GBS occurred in a medically acceptable timeframe. Accordingly, I must **DISMISS** his claim in its entirety.

**The Clerk shall enter judgment accordingly.**[8]

---

[7] I am also not required to conduct an evidentiary hearing, even if a petitioner requests one. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers where (in the exercise of their discretion) they conclude that doing so will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d).

[8] If Petitioner wishes to bring a civil action, he must file a notice of election rejecting the judgment pursuant to § 21(a) "not later than 90 days after the date of the court's final judgment."

**IT IS SO ORDERED.**

**<u>s/Brian H. Corcoran</u>**
Brian H. Corcoran
Chief Special Master